ROBERT J. PRAY, Curator ESTATE JOHN C. CORNWALL, Respondent, v. UNION CASUALTY AND SURETY COMPANY, Appellant.

St. Louis Court of Appeals, March 1, 1898.

Instructions: OBJECTIONS THERETO. It is true that the instruction presents only a practical view of the case, but it does not direct a verdict on the entire case, provided the issues therein submitted are found in favor of the plaintiff. It is well settled that a partial view of a general expression in an instruction may be supplied or explained by other instructions.

*Appeal from the Greene County Circuit Court.*—HON. JAMES T. NEVILLE, Judge.

AFFIRMED.

*Delaney & Hamlin* for respondent.

The rule is that all the instructions must be read together; and when thus read and considered together, the law of the case is properly declared, and there is no error. *Korle v. R. R.*, 55 Mo. 476; *Swan v. Lullman*, 12 Mo. App. 583; *McKeon v. R. R.*, 43 Mo. 405; *Benham v. Taylor*, 66 Mo. App. 308. Where there are several points involved in a case it is proper to give separate instructions on each point; and if they, taken together, harmonize there is no error. *Korle v. R. R.*, 55 Mo. 476, at page 482; *Kinney, Adm'x, v. City of Springfield*, 35 Mo. App. 97, at page 108.

*E. S. Curtis* for appellant.

The court clearly erred in giving instruction numbered 3 as requested by plaintiff, as such instruction

does not cover the entire case, but only part of the same, and directs the jury to return a verdict in favor of the plaintiff if they should find in favor of the existence of the facts therein named, which facts are not all the facts in the case that were essential and necessary for the jury to find in order to entitle plaintiff to a verdict. This has repeatedly been held to be reversible error in this state. *Hohstadt v. Daggs*, 50 Mo. App. 240; *Fink v. Phelps*, 30 Mo. App. 431, at 435; *Mack v. Snyder*, 57 Mo. App. 425, at 434; *Bank v. Armstrong*, 62 Mo. 70. This instruction ignored one of the main defenses relied upon by the defendant, that the plaintiff had failed to give immediate written notice of the death as required by the terms of the policy. The error in this instruction was not cured by giving other instructions at the request of plaintiff or defendant. *Hohstadt v. Daggs*, 50 Mo. App. 240; *Goutz v. R. R.*, 50 Mo. 472; *Black v. R. R.*, 122 Mo. 533. It is the settled law of this state that an erroneous instruction can not be cured by another instruction that flatly contradicts it, as the court has no means of determining which instruction the jury acted upon. *State v. Harold*, 97 Mo. 105, at 110; *State v. Cable*, 117 Mo. 38; *State v. McNally*, 87 Mo. 642, at 650; *State v. Sims*, 68 Mo. 305, at 309; *State v. Brumley*, 63 Mo. App. 136; *Frank v. R'y*, 57 Mo. App. 180; *Redpath v. Lawrence*, 42 Mo. App. 101; *Morton v. Preston*, 110 Mo. 456.

BIGGS, J.—The defendant issued an accident policy of insurance on the life of John C. Cornwall, in which it agreed to pay to plaintiff's ward the sum of $2,000, if, during the life of the policy, the death of the assured should result from external, violent and accidental means, except the death should result from "injuries intentionally inflicted upon the assured by

any other person, injuries from unprovoked assaults excepted." Prior to the expiration of the policy the assured was killed by one John McManis. The defendant denied liability under the policy upon the ground that the assured provoked the shooting which resulted in his death. There was a trial before a jury, which resulted in a verdict and judgment for the amount of the policy. On this appeal the chief contention of the defendant is that the great weight of the evidence tends to prove that the assault was provoked by the assured and that the opposing evidence is so weak and unsatisfactory as to make it manifest that the finding of the jury as to that issue was the result of passion and prejudice. This assignment requires a detailed statement of the evidence.

The shooting occurred on the morning of the eighth of August, 1896, in Jonesboro, Arkansas. McManis was a trainmaster on the St. Louis and Southwestern Railroad Company. Cornwall had been a conductor on a freight train on the same road. Several weeks prior to the difficulty McManis caused the discharge of Cornwall. In addition to this Cornwall believed that McManis had seduced his (Cornwall's) wife. Cornwall was very hostile to McManis and at different times threatened to kill him. These threats were communicated to McManis. For several days prior to the homicide Cornwall had been away from Jonesboro. He returned the evening of the seventh of August. On the next morning he went to the railroad station. He was without his coat and was unarmed. He met McManis on the platform of the station. They exchanged a few words, when McManis shot him with a pistol. The bullet entered the brain and produced instant death. The record contains the testimony of four witnesses, who professed to have seen the shooting. F. L. Nasor, after testifying to some pre-

liminary matters was asked this question: "*Q.* What was Cornwall doing when the shot was fired? *A.* He wasn't doing anything. He had his back turned partly toward me. * * * I was about 175 feet from the scene of the killing. *Q.* Was there anything between you and Cornwall to prevent you from seeing what took place? *A.* No, sir. *Q.* State whether or not Cornwall was making any demonstration when the shot was fired? *A.* Neither of them were. *Q.* Did you see McManis present his pistol and fire? *A.* No; Cornwall was between me and McManis—there with his side to McManis. Cornwall did not have his coat on and was in his shirt sleeves. He was standing there doing nothing, and when the shot was fired he fell. * * * "

The following is from the testimony of Fritz Hoffman:

"*Q.* What took place between McManis and Cornwall? *A.* I was passing down the platform with some ice. I was going to wait on that passenger train and I saw McManis with a revolver in his hand and he was walking toward Cornwall, and Cornwall was backing away from him, and McManis kept on walking toward him and I suppose he was playing with the revolver. I passed on by and just as I got by the shooting commenced. He shot and Cornwall fell. Cornwall was shot in the upper jaw and he dropped dead instantly. *Q.* What was Cornwall doing when you saw McManis take his pistol out and move to where Cornwall was? *A.* Cornwall was backing away from him. *Q.* How far apart were they when you first saw McManis pull out his pistol? *A.* Eight or ten feet; he got closer before the shot was fired. It looked like they were going to give up the trouble, for McMannis turned away then turned around and shot Cornwall." * * *

The defendant introduced McManis, who testified that on the morning of the killing he intended to leave Jonesboro and he went to the station to take the early morning train, and he met Cornwall on the platform, when the latter said to him: " 'You son-of-a-bitch; I suppose you are satisfied now, you are going after my wife.' I says: 'No, Cornwall, I am going to my wife,' and he made some very insulting remarks that I was a God damned liar, he knew that I was going after his wife and all this, and I tried to argue with him and convince him."

A. J. Ward testified as follows: "Q. I will ask you if you were present at the time McManis shot and killed Cornwall. A. I was, yes, sir. Q. State what you saw of it, and all about it? A. I never seen much; I was there at the depot loading soda pop cases on some trucks and two men were there talking, but I didn't think that they were quarreling at the time until I heard Cornwall make the remark, "I will kill you," and I turned and noticed the two men, and about the time I turned or a little afterward, McManis shot him. Cornwall had a pick handle at the time I saw him, but he didn't get the pick loose because it was fastened in the end of a pipe. Q. And before he got it loose he was shot. He was trying to get it loose? A. Yes, and McManis shot and killed him, that is all I know." The witness stated on his cross-examination that it might have been McManis who said "I will kill you."

If the character of the assault is to be judged by what occurred at the time of the shooting, there can be no question that the finding of the jury that McManis was the aggressor is supported by substantial evidence. Hoffman is the only disinterested witness who saw the entire difficulty. He says that when McManis drew his pistol he was eight feet from Cornwall, that he

advanced on Cornwall, and that the latter backed off and tried to avoid a difficulty. On his re-examination he stated that Cornwall did not take hold of the handle of the pick as testified to by McManis; that he had nothing in his hands and that he offered no resistance whatever. But it was urged on the argument that by reason of the threats of Cornwall to kill McManis, it must be held that Cornwall "provoked" the assault within the meaning of the contract of insurance, and hence it was immaterial that McManis was the aggressor at the time of the killing. The answer to this is that the defendant did not try the case on that theory. All of the instructions of the defendant, and especially the sixth, make this clear. The sixth instruction is as follows:

"The court instructs the jury that before plaintiff can recover in this case, it must appear from the evidence that the assault made upon the deceased by McManis was without any provocation, that this without McManis being provoked thereto by anything deceased did or said *at the time of the killing*, and if the assault was so provoked, you will find the issues for the defendant."

Complaint is made of the third instruction given for plaintiff, which is as follows:

"If the jury believe from the evidence that the deceased, John C. Cornwall, was intentionally shot and killed by one McManis on the 8th of August, 1896, that such assault was unprovoked, that is to say, that said McManis was the aggressor and assaulted Cornwall when and while he, the said Cornwall, was making no demonstration and was in no way provoking said McManis, then such killing is an accident within the meaning of the policy sued on, and you will find the issues for the plaintiff."

The objection urged against the instruction is that it ignores other issues and directs a verdict for the plaintiff, if the jury should find that McManis was the aggressor. This criticism is not, in our opinion, well founded. It is true that the instruction presents only a partial view of the case, but it does not direct a verdict on the entire case, provided the issues therein submitted are found in favor of the plaintiff. The last clause in the instruction is inartificially drawn, but it is evident that the word "issues" therein, referred only to the matters stated in the instruction, and the jury must have so understood it.

We are fully justified in this conclusion as the other instructions, especially those given for the defendant stated the other issues and required the jury to pass on all of them. It is well settled INSTRUCTION: partial view: may be supplied. that a partial view of a general expression in an instruction may be supplied or explained by other instructions. *Goetz v. R. R.*, 50 Mo. 474; *Hohstadt v. Daggs*, 50 Mo. App. 240.

Other assignments are presented in the briefs, but they were not pressed on the argument. We think it clear that the defendant has no just ground of complaint on account of them. The judgment of the circuit court will be affirmed.

All concur.